### T. WILCE CO. *v.* KELLEY SHINGLE CO.

1. CONTRACTS—FURNISH OR MANUFACTURE.
   A contract by a mill owner to furnish a certain quantity of lumber of specified kinds and dimensions, and pile the same in his yard, does not require him to manufacture it in his mill.

2. SALE OF LUMBER—ACCEPTANCE IN CARGO LOTS.
   A mill owner with mill capacity of 20,000,000 feet for a season, and yard capacity for 4,000,000 feet, contracted to furnish defendant with various kinds of lumber to the amount of 4,000,000 feet, cross-pile it in the yard for 60 days, and freight same to any port at going rates.   Defendant agreed to take the lumber after being piled 60 days, and have the "deal cleaned up" by November 1st; terms of sale, 60 days from shipping.   *Held*, that defendant was obligated to accept the lumber in vessel lots as soon as sufficient had been piled for 60 days.

3. SAME—DIVISIBLE CONTRACT.
   Such contract is divisible, but contains no agreement requiring plaintiff to furnish proportionate quantities of each kind of lumber in each cargo lot.

4. SAME—CHANGE IN CONTRACT—TIME OF DELIVERY.
   Where under such contract defendant, on account of the dullness of the market, has obtained a waiver of the time of delivery, it cannot insist on the provision requiring plaintiff to have the lumber piled and ready for shipment on September 1st.

5. NEW TRIAL—CONSENT TO INSTRUCTION.

   A new trial will not be granted upon an 'erroneous charge to which both parties consented.

Error to Grand Traverse; Mayne, J.   Submitted February 19, 1902.   (Docket No. 36.)   Decided April 8, 1902.

*Assumpsit* by the T. Wilce Company against the Kelley Shingle Company for the breach of a contract of purchase.   From a judgment for plaintiff, defendant brings error.   Affirmed.

Plaintiff, an Illinois corporation, owns and operates a large lumbering plant at Empire, Mich., with lumber yard, docks, timber supply, and a railroad extending from the mill through its timber land.   Defendant, a Michigan corporation, is engaged in the business of buying and selling lumber, with its principal office at Traverse City, Mich.   The capacity of plaintiff's mill was 100,000 feet per day.   Its lumber yard, in the vicinity of its mill, has a capacity of 4,000,000 feet, and 5,000,000 feet could be piled in it, by transferring some of the lumber a half mile. Empire had no railroad connection, and all lumber was shipped by vessel.   Plaintiff manufactured and sold lumber for other parties during that season, and had all the work it could do.   The parties entered into the following agreement:

"This contract, made this 30th day of January, 1900, by and between the T. Wilce Co., of Chicago, Ill., parties of the first part, and the Kelley Shingle Co., of Traverse City, Mich., parties of the second part.

"Parties of the first part hereby agree to furnish parties of the second part four (4) million feet of hemlock lumber, over rail of boat at Empire, Mich.   Parties of the second part hereby agree to pay for same as follows:   One million (1,000,000) feet of one-inch merchantable hemlock at $10.50 per M.; two million two hundred and fifty thousand (2,250,000) feet of two (2) inch merchantable hemlock, 10, 12, 14, and 16 feet, at $10 per M.; four hundred and fifty thousand (450,000) feet of two (2) inch merchantable hemlock, 18 and 20 feet, at $10 per M.; three hundred

thousand (300,000) feet of two (2) inch merchantable hemlock, 22 and 24 feet, at $10 per M.; six and eight feet and mill culls at one-half price. Above lumber to be inspected by L. E. Collins & Co., of Empire, Mich. Each party to pay one-half inspection fees. Terms of sale, 60 days net from date of shipping. Parties of the first part agree to cross-pile this lumber sixty (60) days, and also agree to freight same to any port at the going freight rates. Parties of the second part agree to take this lumber after being in pile for sixty (60) days, and to have the deal cleaned up by the first of November, 1900."

Plaintiff entered upon the performance of the contract. In May plaintiff notified defendant that two cargoes were ready for shipment. On May 24th defendant wrote plaintiff, asking for a rate of $1.50 per thousand. Plaintiff answered the letter the following day, saying that $1.50 was too low, and offering to carry it for $1.75; again saying to defendant that it had a cargo of one-inch and a cargo of two-inch ready, and wanted to move it, and further saying:

"If you will let us do [ship] this at once, we will freight it at this rate, but could not guarantee to do so later on at this figure, as we feel freights will be up."

To this defendant replied May 29th:

"Replying to yours of the 25th: We instructed our salesman to dispose of one-half million feet of hemlock from Empire, based on our paying a dollar fifty freight, and we will not have any difficulty in getting this rate from some of the coal boats that are up north, for there is a number of schooners laying around Charlevoix, waiting for loads going east, all of the time, and it has been a snap, as far as rates have been concerned, so far this season. Now, if you cannot see your way clear to carry this stock at this rate, of course, you cannot object to our giving it to some other boat. We understand from Mr. Dailey that this stock is now dry,—that is, a large proportion of the one-inch was cut last fall,—and you want to take this into consideration when making the rate. Of course, we would not expect, if you made a rate upon this first load of $1.50 per M., that this would establish a rate for the season in case rates advance, but would be for this load only.

"Awaiting your reply, we remain."

130 MICH.—21.

To this letter, on May 31st, plaintiff replied:

"Your favor of the 29th received, and contents fully noted. In regard to our freighting the hemlock from Empire at $1.50, will say we would not do it; would want $1.75. If you can get it freighted for that, we have no objections to your doing so. The only thing we want is to get the stock moved at once, so don't disappoint us in this respect.

"We notice you state in your letter that there is only half a million ready at Empire. The writer's recollection is that there is a cargo of one-inch and a cargo of two-inch. We would like to move both cargoes as soon as possible, so kindly do so."

On June 5th defendant again wrote plaintiff as follows:

"Replying to yours of the 31st: We will not experience any difficulty in obtaining tonnage at $1.50 per M. feet on hemlock from Empire to Detroit or Toledo. The only trouble we are experiencing now is to get some one to take the stock. The dictator just returned from those two points, and expected to be able to make a price when there to move at least one-half million,—the amount that Mr. Dailey wished us to ship out at once. But it is not a matter of price at the present time. The yards have no use for the stock, and it was impossible to make a price that would induce any one to buy. Now, we are in correspondence with a number of concerns further east, and we hope to be able to close out at least a half a million soon, and we will assure you that we are going to do our best to move this stock, and reasonably prompt. But you fully realize the situation at this time. It is not a matter of price, but there is no demand, and, as long as this condition exists, we cannot hope to move the stock very rapidly. We do not expect that this dullness is going to exist all the year. However, we do expect that there is not going to be but a very little trade until about the first of September, for we always look for a dull lumber trade during July and August. It seems to us that on account of there not being a demand for stock this spring, and but very little having been sold, that there certainly will be a good, brisk trade this fall. We are going to take this stock and move it as near according to contract as possible, but you will have to, in return, show some leniency in reference to the time of shipment; for you realize that, when there is no trade,

that it is a matter of impossibility to move stocks.   Trusting that you will bear with us in this matter, we remain."

To this plaintiff replied:

"We will say, however, that, if it is any object to you for us to hold this lumber for some time, we would do so, but would insist upon same being paid for, as we do not think it is just and right for you to ask us to hold the stock after it is ready for shipment, without receiving our money."

June 22d the defendant claimed that some of the lumber was improperly manufactured, and plaintiff executed an agreement to reimburse defendant for any reduction in price it might have to make in disposing of the lumber to its customers.   August 30th the defendant sent two of its members to plaintiff's mill to examine the lumber.   They found that the entire 4,000,000 feet had not been manufactured, and on September 1st defendant wrote plaintiff as follows:

"*Dear Sirs:*   In view of the fact that you have made default in manufacturing lumber under contract with us bearing date January 30, 1900, and have not placed all the lumber in cross-pile on September 1st, according to the said contract, by reason of which default we will be unable to move the stock this season according to agreement, we hereby declare said contract void, and refuse to accept any lumber thereunder."

This letter was the first intimation to plaintiff that defendant did not intend to accept and ship the lumber. Plaintiff replied September 4th, demanding that defendant commence moving the stock by September 20th, and notifying it that, unless this was done, plaintiff would sell to the best advantage, and charge defendant with the difference.   Defendant refused to do so, and this suit was brought to recover damages for breach of the contract by defendant.   Plaintiff gave evidence tending to show that it had piled in its yard all the lumber required by the contract, except about 250,000 feet, and defendant claimed that the deficiency was much greater.   During the season

the price of lumber had materially declined. Plaintiff
sold, before suit was brought, 995,000 feet, on which the
difference between the contract price and the market price
was $3,136.36. Plaintiff recovered verdict and judgment.

*Pratt & Davis* and *Patchin & Crotser*, for appellant.
*Smurthwaite & Foster* and *A. F. Bunting*, for appellee.

GRANT, J. (*after stating the facts*). While there
are 49 assignments of error, the questions upon which the
right of recovery turns are but few, and depend almost
entirely upon the construction to be placed upon the con-
tract.

1. It is contended by counsel for the defendant that by
the contract plaintiff was bound to manufacture the lum-
ber at its mill, while plaintiff insists that it was at liberty
to obtain the lumber where it chose, so long as it was of
the character and kind specified in the contract. The
contract contains no language indicating a contract to
manufacture the lumber at the plaintiff's mill. Plaintiff's
contract was to furnish to the defendant 4,000,000 feet of
lumber. To "furnish" does not mean to manufacture.
It is a fair construction, from the use of the word, that
plaintiff desired to guard against many contingencies that
might arise if it agreed to manufacture the lumber at its
own mill. The mill might burn, other accidents might
happen, or other things occur which would render it im-
possible for plaintiff to execute the contract. If it con-
tracted to manufacture without guarding against such
contingencies, it would be bound by its contract to do so.
The contract is too plain to require construction. Plain-
tiff had the right under it to manufacture or buy the lum-
ber for the defendant. Its contract was to furnish, not to
manufacture.

2. It is next contended that the plaintiff was under
obligation to cross-pile all the lumber in its yard, to do
this by September 1st, and that defendant was under no
obligation to accept or ship any of the lumber until after

that date, and it was all piled in the yard ready for shipment. We are of the opinion that this construction should not be placed upon the contract, and that the defendant obligated itself to accept and have the lumber shipped in vessel lots as soon as sufficient had been piled for that purpose for 60 days. The capacity of plaintiff's mill was 100,000 feet per day. The capacity of its yard in the vicinity of its mill was about 4,000,000 feet. But 5,000,-000 could be piled upon its grounds by moving lumber a half a mile. The capacity of the mill for this season would have been over 20,000,000 feet. Defendant knew that plaintiff was manufacturing other lumber in large ·quantities. The letters and conduct of both parties show that the contract was so understood.

3. It is next urged that if this contract was divisible, and defendant was bound to accept it in cargo lots, each cargo ·should contain proportionate quantities of each kind of lumber. Counsel cite *Crowl* v. *Goodenberger*, 112 Mich. 683 ( 71 N. W. 485 ), as sustaining this contention. If this were an indivisible contract, and plaintiff had bound itself to furnish the entire amount before any was shipped, ·that case would apply and be controlling. In that case it was held that the defendant was " bound to tender the whole amount of the lumber, as plaintiff was not bound to accept a part only." In this case, as above stated, defendant was bound to accept it in parts. Plaintiff would have performed its contract by furnishing the proper quantities of the various kinds before the time fixed for its completion. If defendant had directed the proportions to be furnished for each cargo, a different question would be presented.

4. It is next contended that it was the duty of the plaintiff to have all the lumber cross-piled and ready for shipment on September 1st, notwithstanding that the defendant had asked not to have the lumber shipped as provided, and had requested plaintiff to consent to delay. We cannot concur in this view. On account of the dullness of the market, and probably the fall in price, defend-

ant asked forbearance on the part of the plaintiff in holding it to shipments as the contract required. This was evidently granted. It undoubtedly changed the obligation of each party to the contract. Defendant obtained a waiver of the time for shipment, which was made definite by the contract. Under this modification it would have a reasonable time in which to ship. It must follow that the contract was also modified in regard to the time of furnishing. Defendant had delayed shipping for three months, and now seeks to repudiate the contract because on September 1st plaintiff did not have the entire amount on hand to ship. Under plaintiff's testimony, it could have furnished the balance of the lumber in a very short time, and not have delayed the defendant in the shipment of it, even if it could have shipped the entire amount between September 1st and November 1st,—a matter of considerable doubt under the evidence.

5. Upon the trial counsel for defendant conceded the rule of damages applicable to the case to be the difference between the market and the contract price. Thus by the consent of both parties the case was submitted to the jury upon that theory. Counsel made a motion for a new trial, alleging as an error that this direction did not state the correct rule of law as applicable to the lumber which plaintiff did not have on hand at the time of the breach of the contract, and which it would have been compelled to obtain by purchase, but that the rule would be the difference between the contract price and the cost of purchasing and delivering the same in its yard at Empire. The court refused the motion. We do not think that, where the question was submitted to the jury by the consent of both parties as to the rule of law, the winning party should be put to the expense of a new trial, even if the direction were wrong, upon which we express no opinion. We concur in the conclusion of the court below in refusing a new trial.

Judgment affirmed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. LONG, J., did not sit.